[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEBRUARY 4, 2009
THOMAS K. KAHN
CLERK

No. 07-12874

_____

D. C. Docket No. 04-00026-CV-4-MMP-AK

ANDREW NGUYEN, MD, an individual,
ANDREW NGUYEN, MD PA, A Florida
Professional Association

                                                            Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA,

                                                            Defendant-Appellee.

_____

Appeals from the United States District Court
for the Northern District of Florida

_____

On  Reconsideration

_____

(February 4, 2009)

Before CARNES and MARCUS, Circuit Judges, and BUCKLEW,[*] District Judge.

CARNES, Circuit Judge:

Although neither party has petitioned for rehearing, we rescind our earlier opinion in this case, Nguyen v. United States, 545 F.3d 1282 (11th Cir. 2008), and substitute this one for it.

This appeal brings us the question of whether the waiver of sovereign immunity in the Federal Tort Claims Act, 28 U.S.C. § 1346(b), extends to claims of false arrest, false imprisonment, and malicious prosecution arising from the acts or omissions of federal investigative or law enforcement officers. See id. § 2680(h). The facts of this case show why Congress has chosen to waive the sovereign immunity of the United States in some circumstances, and the plaintiff's story illustrates the value of living in a country where a citizen may pursue claims against the government in those circumstances.

## I.

Andrew Nguyen overcame a lot of obstacles on his way to becoming a citizen of the United States of America entitled to the full protection of its laws. He was born in Hanoi in 1938. When the communists took control of North

---

[*] Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

Vietnam, he moved south at age sixteen. At age twenty-five, Nguyen completed a pre-medical education program at a college in Saigon. Later he earned a medical degree from a school in Saigon that was accredited by the American Medical Association. During the Vietnam War, Dr. Nguyen served as a combat physician in the South Vietnamese army for three years, eventually earning the rank of captain. He was injured in combat.

After the communists took over South Vietnam, Dr. Nguyen was arrested at the temporary hospital where he worked. Falsely accused of being a spy left behind by the CIA, he was imprisoned for a year. In prison he was forced to do hard labor that injured his back. When Dr. Nguyen was finally released from prison, he went to work at a private, 600-bed Chinese hospital in Saigon, serving as chief of the emergency room for two years and then as chief of internal medicine for another two years.

Dr. Nguyen attempted to escape from Vietnam more than once. In 1978 after his first escape attempt failed, the forty-year-old Dr. Nguyen was put in jail again, this time for nine months. After he got out, Dr. Nguyen began planning another escape, one that eventually included eighty-one people desperate to flee communist rule. Through a perilous, four-day sea voyage in an old boat burning gasoline that had been bought one gallon at a time on the black market, the group

managed to escape to the seashore of Thailand. They spent months in a refugee camp there.

With the help of some relatives in this country, Dr. Nguyen then made his way to America. He was required to pass three examinations to get his American medical license. In the meantime he worked at a newspaper as a translator and also served at a VA hospital as a volunteer physician. He ultimately obtained two state medical licenses, one from Florida and the other from Massachusetts.

A friend of his put Dr. Nguyen in contact with a physician in Trenton, Florida who was selling his medical practice. When Dr. Nguyen bought the practice in 1984, he was the only licensed medical doctor in Trenton, which had a population of less than 1,500. See United States Bureau of the Census, United States Census of Population: 1990 General Population Characteristics, Florida 1-11-9, Table 1; id. 1980 Number of Inhabitants, Florida 1-11-22, Table 5. He eventually received hospital privileges at Shands Teaching Hospital and at North Florida Medical Center, both of which are located in a neighboring county.

The year 1986 was an important one for Dr. Nguyen. He became a citizen of the United States of America.

On March 23, 2000, Dr. Nguyen was sixty-two years old and had been practicing medicine in Trenton for sixteen years. The day started out like any

other for him. He was in his office treating patients. A deputy from the Gilchrist County Sheriff's Office came into Dr. Nguyen's office and arrested him without warning or explanation. The deputy was accompanied by Robert Yakubec, an agent of the Drug Enforcement Agency, who removed from the wall a certificate that authorized Dr. Nguyen to prescribe controlled substances for his patients. The officers did not give the doctor a chance to explain whatever they thought he had done wrong. They told him that he had no choice but to go to jail. Dr. Nguyen informed his wife, who worked at the front desk, that he was being carried to jail. He got into the back of the police car and was taken there.

The two officers who photographed and fingerprinted Dr. Nguyen at the jail were patients of his. They took all of his personal belongings and issued him an inmate uniform. He was held in jail for about five hours. When he was released at the end of the day, Dr. Nguyen still did not know why he had been arrested.

Dr. Nguyen later learned that he had been arrested for six counts of delivery of a controlled substance in violation of Fla. Stat. § 893.13(1)(a), which makes it a crime to deliver a controlled substance "[e]xcept as authorized by this chapter." That chapter of the Florida Code authorizes medical doctors to dispense or prescribe controlled substances "in good faith and in the course of his or her professional practice only." Fla. Stat. § 893.05(1). The crime alleged in a six-

count arrest warrant was that Dr. Nguyen had delivered Lortab and Valium, which contain the controlled substances hydrocodone and diazepam, "to a confidential source by use of a written order for said drug[s] not issued in good faith and in the course of his professional practice, contrary to section 893.13(1)(a)(2)." The not in good faith and not in medical practice elements were more specifically described in the affidavit underlying the warrant. It accused Dr. Nguyen of issuing prescriptions for those two controlled substances to a confidential informant "without any type of physical examination or medical need." From the warrant and affidavit it is clear that if the drugs were prescribed after physical examinations and in the course of Dr. Nguyen's medical practice, there was no crime. The parties agree about that.

Dr. Nguyen returned to work the day after his arrest hoping to practice medicine as he had done before, but he couldn't. A pharmacy informed him that he could no longer prescribe anything—not even cough syrup. His arrest was headline news in the local media. Patients began calling to ask if he was a criminal.

The charges against Dr. Nguyen were nol prossed on May 17, 2000, 55 days after the arrest, because of "insufficient evidence as to this defendant." That action did not undo the harmful domino effect the arrest had on his medical

6

practice. Health insurance companies, whose payments had been fifty to sixty percent of his professional income, cancelled their contracts with him. That caused him to lose patients who paid with health insurance. The loss of those patients caused a financial strain on his practice, making it difficult for him to retain employees and to purchase equipment and supplies. As a result, he had to let one of his three employees go. Even after Dr. Nguyen got his prescription privileges back several months later, no health insurance provider would agree to contract with him again.

What happened to Dr. Nguyen's practice is what happens to the established professional practices of medical doctors who are caught committing crimes involving controlled substances. If the record before us is to be believed, however, Dr. Nguyen committed no crime. It is not just that the charges against him were dismissed on insufficient evidence grounds. It is more than that. The record, as it now exists, indicates that Dr. Nguyen's arrest was not based on any evidence of wrongdoing at all. All of the evidence that law enforcement officers had then, as well as now, showed that he was guilty of no crime.[1] They arrested

---

[1] We emphasize that our statements are based on the record before us and the record as it now exists. The United States was dismissed on sovereign immunity grounds before trial, and for that reason we take the allegations of the complaint as true. Dr. Nguyen's claims against the sheriff and deputy sheriff, whom he also named as defendants, went to trial, and the jury found the two of them liable on various claims. Although this appeal involves only the defendant United States, we have drawn some of the facts from the trial. Those facts are entirely consistent

him anyway.

Dr. Nguyen's arrest grew out of a three-month investigation led by DEA Agent Robert Yakubec, who was the head of a controlled substances task force targeting several physicians in the area. Three times during the investigation Dr. Nguyen prescribed Lortab and Valium, which contain controlled substances, to a patient who was also a confidential informant for the task force. On each of those occasions Dr. Nguyen or a member of his staff had first conducted a physical examination of the informant patient. All of the evidence the task force obtained during the investigation showed that those examinations had been performed each time. The task force even had tape recordings of that informant patient's office visits with Dr. Nguyen proving that a physical examination was conducted on each of the three visits. After every visit the task force had the informant patient sign an affidavit describing what had happened while she was in Dr. Nguyen's office, and in those affidavits she described the physical examinations that had been conducted before she got the prescriptions. Records in Dr. Nguyen's office not only showed that the patient had been examined but also that she was there with

---

with the amended complaint and provide background information for present purposes. On remand, however, the actual facts will have to be developed or re-developed in summary judgment proceedings or at a trial in which the United States has an opportunity to defend its interests on grounds other than sovereign immunity.

complaints about "nervousness," "insomnia," and "pain," which she told the doctor she had been experiencing for "months." Those records, which were consistent with the covert tapes and the informant patient's affidavits, indicated that the drugs were prescribed by Dr. Nguyen in good faith during the course of his medical practice, but none of the officers asked for those records before charging him with a crime.

Deputy Carlisle of the Gilchrist County Sheriff's Office was the actual arresting officer. He died before trial but had given a deposition which was read into evidence. In that deposition Carlisle described how the DEA had targeted several physicians in the area for dispensing controlled substances without giving patients a physical examination. It was all a DEA operation and the Sheriff's Office was "just there to assist them." Robert Yakubec was the DEA agent in charge.

Deputy Carlisle was told by the DEA agents that a confidential informant had gone to Dr. Nguyen's office and had gotten a prescription without being given a physical examination. Carlisle was the one who wrote out the affidavit used to secure a warrant to arrest Dr. Nguyen. Carlisle testified, however, that he had never spoken with the confidential informant about whether she had received a physical examination. He also conceded that he did not know what physical

9

conditions justified a prescription for Lortab or Valium.

Deputy Carlisle did not receive any evidence from the investigation until after Dr. Nguyen had been arrested. His only information about the case and the alleged absence of a physical examination of the confidential informant came from the DEA. He explained that the DEA "took control of all the evidence. They had it all. All we were there for is to work with them because it was in our jurisdiction." Specifically, he noted that the DEA took control of all the recordings and the taped statements.

When asked why a physician or pharmacist was not consulted before he signed the arrest affidavit, Deputy Carlisle responded that the "DEA, Mr. Bob [Yakubec] and them was running the show and they were doing it the way they seen fit." He testified that if he had known that a physical examination had been conducted, he never would have included a statement to the contrary in the arrest affidavit. When asked whether he made "any attempt to confirm that statement independently" or whether he relied "totally on the statements of Agent Yakubec," he replied: "Totally on DEA." According to Carlisle, Yakubec sat in the room while Carlisle typed up the arrest affidavit. He showed it to Yakubec, among others in the room, and all agreed that what it described—controlled substances being distributed without a physical examination—was what had taken place. The

10

problem is that was not true.  There had been a physical examination each time before medication was prescribed.  The affidavit and arrest warrant were based on a false statement.

## II.

When he was wrongly jailed by the government of Vietnam and its agents, Dr. Nguyen had no remedy but to flee from the country.  As an American citizen, though, he has a better remedy for that kind of abuse of governmental power.  He sued.  By the time a third amended complaint had been filed in the district court, Dr. Nguyen, his medical practice (suing as a professional association), and his wife (suing solely as a co-owner of the professional association) were asserting a number of claims against Deputy Carlisle, the Sheriff of Gilchrist County, and the United States as the employer of DEA Agent Yakubec.  After the district court granted the United States' motion to dismiss it on sovereign immunity grounds, the claims against the Sheriff and (the estate of) Deputy Carlisle went to trial.  A jury found for Dr. Nguyen and his medical practice on their malicious prosecution and false arrest claims against Deputy Carlisle and the Sheriff, and it also found for them against Deputy Carlisle on their Fourth Amendment claim (called a "civil rights claim" in the jury instructions and verdict form).  The jury assessed damages in the total amount of $1,836,100.  After the district court entered judgment

11

against the deputy and sheriff in that amount, they appealed. While their appeal was pending, they and Dr. Nguyen settled.

All that remains of the lawsuit at this point is the appeal by Dr. Nguyen and his medical practice from the district court's dismissal of their claims against the United States as Agent Yakubec's employer. Those claims are for false arrest, false imprisonment, and malicious prosecution. The district court dismissed the claims against the United States for lack of jurisdiction solely on sovereign immunity grounds. The validity of that dismissal turns on whether the United States waived its sovereign immunity in the Federal Tort Claims Act.

## III.

When interpreting a statute, we always begin with its plain language. See, e.g., Harris v. Garner, 216 F.3d 970, 972–73 (11th Cir. 2000) (en banc); In re Griffith, 206 F.3d 1389, 1393 (11th Cir. 2000) (en banc); United States v. Steele, 147 F.3d 1316, 1318 (11th Cir. 1998) (en banc). Section 1346 of the FTCA provides in part that:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the

12

law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). That paragraph is a general waiver of sovereign immunity, but some of the waiver is taken back in the "Exceptions" section of the FTCA, which provides, among other things, that the waiver in § 1346(b) "shall not apply to":

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

Id. § 2680(a). That subsection, which often is referred to as the discretionary function exception, generally shields the government from tort liability based on the acts or omissions of federal agencies and employees when they are exercising or performing a discretionary function.[2] See, e.g., United States v. Gaubert, 499

---

[2] The test to determine whether a federal employee was exercising a "discretionary" function that would invoke sovereign immunity is as follows:

> The Supreme Court in [United States v.] Gaubert [, 499 U.S. 315, 111 S. Ct. 1267 (1991),] developed a two-step test to determine whether the government's conduct meets the discretionary function exception. We consider first whether the conduct involves an element of judgment or choice, which will be the case unless a federal statute, regulation, or policy specifically prescribes a course of action embodying a fixed or readily ascertainable standard. The conduct need not be confined to the policy or planning level.
>
> We then ask whether the judgment or choice is grounded in considerations of public policy, because the purpose of the discretionary function exception is to

13

U.S. 315, 322–23, 111 S. Ct. 1267, 1273–74 (1991) (explaining that "the purpose of the [discretionary function] exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, [and] when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy" (citations and quotation marks omitted)). The subsection shields the government from liability by taking claims that arise from discretionary functions out of the waiver of sovereign immunity contained in § 1346(b).

Before 1974 there was also a provision in § 2680 that unequivocally barred (by excepting from the waiver of sovereign immunity): "Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract

<hr>

prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion. Our inquiry does not focus either on the subjective intent of the government agent, or on whether the agent actually weighed policy considerations, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

Cranford v. United States, 466 F.3d 955, 958 (11th Cir. 2006) (alterations, citations, and quotation marks omitted).

rights." 28 U.S.C. § 2680(h) (1970). Whether a particular claim that was barred because it arose out of one of the torts specified in § 2680(h) was also barred by § 2680(a) because it resulted from a discretionary function did not matter. Once barred was enough. Sovereign immunity would bar "any claim" arising out of the causes of action listed in subsection (h) regardless of whether the conduct of the government agency or official was "discretionary" within the meaning of subsection (a). See, e.g., Blitz v. Boog, 328 F.2d 596, 599 (2d Cir. 1964) (holding that because subsection (h) barred plaintiff's false imprisonment claim, the court did "not have to pass upon the government's claim that the action is barred because the acts complained of were within the 'discretionary function' provision of 28 U.S.C.A. § 2680(a)"). That was the statutory situation until Congress changed it in 1974.

That year Congress amended the statute by adding an important proviso to § 2680(h), which turned that subsection around as to specified claims against federal investigative and law enforcement officers. See Pub. L. No. 93-253, § 2, 88 Stat. 50, 50 (1974). Instead of excepting those claims from the waiver of sovereign immunity, as the subsection originally had, the proviso included them within the waiver. The specified claims are "any claim arising . . . out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious

15

prosecution" based on acts "of investigative or law enforcement officers of the

United States . . . ." Id. As amended, § 2680(h) now reads in its entirety:

> The provision of this chapter and section 1346(b) [the general waiver of sovereign immunity] of this title shall not apply to—
>
> *       *       *
>
> (h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: Provided, That, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution. For the purpose of this subsection, "investigative or law enforcement officer" means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.

28 U.S.C. § 2680(h). The "date of the enactment of this proviso" was March 16,

1974. See § 2, 88 Stat. at 50.

The straightforward meaning of subsection (h) as it now reads is that the

United States has expressly waived its sovereign immunity for the claims listed in

the proviso, which includes the claims made in this case. We must determine,

however, how that subsection interacts with subsection (a). See Wachovia Bank,

N.A. v. United States, 455 F.3d 1261, 1267–68 (11th Cir. 2006) ("[I]n order to

16

determine the plain meaning of the statute we must consider both the particular statutory language at issue and the language and design of the statute as a whole." (quotation marks omitted)). The government's position would mean that the waiver of sovereign immunity in the § 2680(h) proviso is taken away by subsection (a) which effectively reasserts sovereign immunity for claims based on discretionary functions. The question is whether the waiver of sovereign immunity in § 1346(b), which is un-waived to some extent by § 2680(a), is re-waived for the claims specified in § 2680(h)'s proviso.

As one court has recognized, the relationship between § 2680(a) and(h) has posed some interpretive problems:

> Federal courts have struggled somewhat in deciding (1) the types of conduct the § 2680(a) discretionary function exception protects; and (2) whether and how to apply the exception in cases brought under the intentional tort proviso found in § 2680(h). The Supreme Court has provided guidance in unraveling the former mystery; the latter question, on the other hand, remains unsettled.

Medina v. United States, 259 F.3d 220, 224 (4th Cir. 2001). Much of the problem is that the "any" in subsection (a) battles the "any" in subsection (h). Section 2680(a) covers "[a]ny claim" involving a discretionary function, and § 2680(h) covers "any claim" arising from the torts that are listed in that subsection. We all know that "any" is all-embracing and means nothing less than all. See, e.g., Ali v.

17

Fed. Bureau of Prisons, 552 U.S. ___,128 S. Ct. 831, 835–36 (2008); United States v. Gonzales, 520 U.S. 1, 5, 117 S. Ct. 1032, 1035 (1997); Laperriere v. Vesta Ins. Group, Inc., 526 F.3d 715, 726 (11th Cir. 2008); Price v. Time, Inc., 416 F.3d 1327, 1336 (11th Cir. 2005). But what happens when two "anys" face off so that they cannot both be all-embracing? Which one must yield?

Two fundamental canons of statutory construction, as well as the clear Congressional purpose behind the § 2680(h) proviso, provide the answer, which is that to the extent of any overlap and conflict between that proviso and subsection (a), the proviso wins. First, the § 2680(h) proviso, which applies only to six specified claims arising from acts of two specified types of government officers, is more specific than the discretionary function exception in § 2680(a), which applies generally to claims arising from discretionary functions or duties of federal agencies or employees. The canon is that a specific statutory provision trumps a general one. See ConArt, Inc. v. Hellmuth, Obata + Kassabaum, Inc., 504 F.3d 1208, 1210 (11th Cir. 2007) ("[W]hen presented with a potential overlap between the broadly sweeping terms of a statute of general application that appear to apply to an entire class, and the narrow but specific terms of a statute that apply to only a subgroup of that class, we avoid conflict between the two by reading the specific as an exception to the general."); Tug Allie-B, Inc. v. United States, 273

18

F.3d 936, 949 (11th Cir. 2001).

Second, the § 2680(h) proviso was brought about through an amendment enacted in 1974, while the (a) subsection has been part of the statute since 1946. When subsections battle, the contest goes to the younger one; the canon is that a later enacted provision controls to the extent of any conflict with an earlier one. See ConArt, 504 F.3d at 1210 ("[W]here two statutory provisions would otherwise conflict, the earlier enacted one yields to the later one to the extent necessary to prevent the conflict."); Tug Allie-B, 273 F.3d at 948–49.

These canons of statutory construction that we apply to § 2680(a) and (h) are an expression of common sense applied to textual interpretation. Consider an analogy. A big, burly doorman guarding the entrance to an exclusive club shouts to a large crowd of people wanting to get in that none of them may enter. Later he speaks specifically to a few people in the crowd and tells them to go on in. No one would doubt that while the general group has been barred a privileged few have been given permission to enter. So it is with § 2680. The later and more specific statement in subsection (h) permitting the listed claims trumps the earlier and more general one in subsection (a) barring a broader class of claims. In that manner the "any" in the proviso to § 2680(h) wins the face off with the "any" in subsection (a).

The result we reach by application of the canons of statutory construction is also required by the Congressional purpose behind the proviso to § 2680(h), which could not be clearer. In enacting that proviso in 1974, Congress made a major change in the law regarding sovereign immunity for certain types of claims arising from intentional torts by particular types of officers. Up until that time subsection (h), which had been enacted in 1946 without the proviso, left sovereign immunity in place as far as eleven listed intentional torts were concerned. The Third Circuit has summed up the legislative intent behind subsection (h) as originally enacted—*before* the proviso was added:

> Section 2680(h) addresses itself primarily to intentional torts for which Congress was unwilling to assume liability. "This section [28 U.S.C. § 2680] specifies types of claims which would not be covered by this title. They include . . . deliberate torts such as assault and battery; and others. . . ." (Emphasis supplied.) S.Rep. No. 1400, 79th Cong., 2d Sess., at 33 (1946); Jayson, Handling Federal Tort Claims, Vol. 2, Sec. 260.01 n. 1.

> In the hearings before the Committee on the Judiciary, House of Representatives, the following colloquy occurred with respect to this exception: "MR. ROBSION. On that point of deliberate assault that is where some agent of the Government gets in a fight with some fellow? MR. SHEA. Yes. MR. ROBSION. And socks him? MR. SHEA. That is right. MR. CRAVENS. Assume a C.C.C. automobile runs into a man and damages him then under the common law, where that still prevails, is not that considered an assault and is not the action based on assault and battery? MR. SHEA. I should think not. I should think under old common law rather that would be trespass on

20

the case.  MR. CRAVENS. Trespass on the case?  MR. SHEA. Yes. MR. CRAVENS. I do not remember those things very well, but it seems to me there are some cases predicated on assault and battery even though they were personal injury cases.  MR. SHEA. No; I think under common-law pleading you have the same writ, but it makes a distinction between an assault and negligence.  MR. CRAVENS. This refers to a deliberate assault?  MR. SHEA. That is right.  MR. CRAVENS. If he hit someone deliberately?  MR. SHEA. That is right.  MR. CRAVENS. It is not intended to exclude negligent assaults?  MR. SHEA. No. <u>An injury caused by negligence could be considered under the bill.</u>" (Emphasis supplied.) Hearings on H.R. 5373 and H.R. 6463 Before the House Committee of the Judiciary, 77th Cong., 2nd Sess., ser. 13, at 33, 34 (1942).

Does the injury sustained by [the plaintiff] arise out of an assault and battery?  Assault and battery by definition are intentional acts. Intention is the very essence of the tortious act.  Congress intended to exclude liability for injuries caused by intentional misconduct and not for negligence. This is consistent with the strong public policy expressed in the statute to waive immunity for injuries caused by negligence of employees and to except claims arising out of assault or battery.

<u>Gibson v. United States</u>, 457 F.2d 1391, 1395–96 (3d Cir. 1972) (some brackets added and footnote numbering omitted).  That was the way things stood for nearly thirty years.

Then came two highly-publicized raids by federal narcotics agents on the homes of innocent families in Collinsville, Illinois.  <u>See</u> S. Rep. No. 93-588 (1974), <u>reprinted in</u> 1974 U.S.S.C.A.N. 2789, 2790.  Both raids were conducted without warrants, both were based on mistaken information, and both occurred on

the same night in the same town.[3]  Id.

In the first of the Collinsville raids federal agents smashed in the door of the Giglotto family's home, brandished pistols, threw Mr. Giglotto down and handcuffed him, interrogated him at gunpoint, pointed a pistol at Mrs. Giglotto as she pleaded for her husband's life, and ransacked the house.  See 119 Cong. Rec. 23246 (1973).  Only later did the agents realize that they were at the wrong address and leave.  Id.  In their wake, they left a smashed television, a broken camera, scattered books and clothes, scratched furniture, a shattered antique dragon, and two distraught people.  Id.; see also id. at 14084.

Later that evening federal narcotics agents led twenty-five members of the same strike force to the home of the Askew family who lived nearby.  Id. at 14085. An agent forced his way in as Mr. Askew tried to close the door.  Id.  His wife fainted.  Id.  The officers searched the home and interrogated Mr. Askew at gunpoint.  Id. at 14085, 23243.  After the officers realized that they were at the wrong house, they left.  Id.

---

[3] The Collinsville raids were widely reported by news media.  See, e.g., In the Name of the Law, Time, May 14, 1973, at 38; Law Enforcement: The Collinsville Reich, Newsweek, May 14, 1973, at 45; Andrew H. Malcolm, Drug Raids Terrorize 2 Families–by Mistake, N.Y. Times, Apr. 29, 1973, at 1, 43.  In discussing the need for an amendment to FTCA § 2680(h), several senators introduced into the Congressional Record news accounts of the raids.  In the next two paragraphs of the text of this opinion we draw facts from that part of the record to show Congress' understanding about what had happened during the raids.

Under § 2680(h) of the FTCA, as it was then written, sovereign immunity barred the innocent victims of the Collinsville raids from recovering damages from the government. See 1974 U.S.C.C.A.N. at 2790. ("There is no effective legal remedy against the Federal Government for the actual physical damage, much less the pain, suffering and humiliation to which the Collinsville families have been subjected.") Congress added the proviso to § 2680(h) to ensure that future victims of these kinds of torts inflicted by federal law enforcement officers or agents would have a damages remedy against the United States.

The Senate Report reinforces our understanding of the purpose of the proviso-adding amendment:

> During the course of these hearings several incidents were brought to the Committee's attention in which Federal narcotics agents engaged in abusive, illegal and unconstitutional 'no-knock' raids. The Committee's amendment is designed to prevent future abuses of the Federal 'no-knock' statute (21 U.S.C. 879). . . .
>
> As a general principle under present law, if a Federal agent violates someone's constitutional rights—for instance, Fourth Amendment rights against illegal search and seizure—there is no remedy against the Federal Government. This ancient doctrine—sovereign immunity—stands as a bar.
>
> Only recently was there even a right of action against the offending officers themselves. In the case of Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that the Fourth Amendment and elementary justice require that there b[e] a right of action against the Federal agents for illegal searches

23

conducted in bad faith or without probable cause. Of course, Federal agents are usually judgment proof so this is a rather hollow remedy.

For years scholars and commentators have contended that the Federal Government should be liable for the tortious acts of its law enforcement officers when they act in bad faith or without legal justification. However, the Federal Torts Claims Act (28 U.S.C. 2671-2680) the embodiment of sovereign immunity in the United States Code, protects the Federal Government from liability where its agents commit intentional torts such as assault and battery. The injustice of thi[s] provision should be manifest—for under the Federal Torts Claims Act a Federal mail truck driver creates direct federal liability if he negligently runs down a citizen on the street but the Federal Government is held harmless if a federal narcotics agent intentionally assaults that same citizen in the course of an illegal 'no-knock' raid. . . .

The Committee amendment to the bill, contained in a new section 2 thereof, would add a proviso at the end of the intentional torts exception to the Federal Tort Claims Act (28 U.S.C. 2680(h)). The effect of this provision is to deprive the Federal Government of the defense of sovereign immunity in cases in which Federal law enforcement agents, acting within the scope of their employment, or under color of Federal law, commit any of the following torts: assault, battery, false imprisonment, false arrest, malicious prosecution, or abuse of process. Thus, after the date of enactment of this measure, innocent individuals who are subjected to raids of the type conducted in Collinsville, Illinois, will have a cause of action against the individual Federal agents and the Federal Government. Furthermore, this provision should be viewed as a counterpart to the Bivens case and its progeny [sic], in that it waives the defense of sovereign immunity so as to make the Government independently liable in damages for the same type of conduct that is alleged to have occurred in Bivens (and for which that case imposes liability upon the individual Government officials involved). . . .

This whole matter was brought to the attention of the Committee in

24

the context of the Collinsville raids, where the law enforcement abuses involved Fourth Amendment constitutional torts. Therefore, the Committee amendment would submit the Government to liability whenever its agents act under color of law so as to injure the public through search and seizures that are conducted without warrants or with warrants issued without probable cause. However, the Committee's amendment should not be viewed as limited to constitutional tort situations but would apply to any case in which a Federal law enforcement agent committed the tort while acting within the scope of his employment or under color of Federal law.

Id. at 2789–91.

Taking the allegations of the complaint in this case as true, as we must at this stage of the proceedings, Agent Yakubec was not acting with probable cause when he arrested Dr. Nguyen, and proceeding against the doctor was malicious prosecution. This is precisely the kind of factual situation for which Congress has expressly and specifically waived sovereign immunity under § 2680(h). It is what the Committee Report meant when it said: "The effect of this provision is to deprive the Federal Government of the defense of sovereign immunity in cases in which Federal law enforcement agents, acting within the scope of their employment, or under color of Federal law, commit any of the following torts: assault, battery, false imprisonment, false arrest, malicious prosecution, or abuse of process." Id. at 2791.

To hold in this case that the discretionary function exception in subsection

25

(a) trumps the specific proviso in subsection (h) would defeat what we know to be the clear purpose of the 1974 amendment.  See Sutton v. United States, 819 F.2d 1289, 1297 (5th Cir. 1987) (concluding that "if the law enforcement proviso is to be more than an illusory—now you see it, now you don't—remedy, the discretionary function exception cannot be an absolute bar which one must clear to proceed under § 2680(h)").  It would also modify the statute by either removing the proviso to § 2680(h), which Congress put there, or by rewriting the words "any claim" in the proviso to mean only claims based on the performance of non-discretionary functions.   We are not authorized to rewrite, revise, modify, or amend statutory language in the guise of interpreting it, Ali, 128 S. Ct. at 841; Artuz v. Bennett, 531 U.S. 4, 10, 121 S. Ct. 361, 365 (2000); In re Hedrick, 524 F.3d 1175, 1187–88 (11th Cir. 2008); Albritton v. Cagle's, Inc., 508 F.3d 1012, 1017 (11th Cir. 2007); Harris, 216 F.3d at 976, especially when doing so would defeat the clear purpose behind the provision.  We would give effect to the plain meaning and clear purpose of the statutory language by concluding that sovereign immunity does not bar a claim that falls within the proviso to subsection (h), regardless of whether the acts giving rise to it involve a discretionary function.

**IV.**

Although the Fifth Circuit agrees with our reconciliation of  § 2680(a) with

(h), see Sutton, 819 F.2d at 1297, five other circuits have taken a different approach about how the two subsections interact. They have concluded that even claims listed in the proviso to § 2680(h) are barred if they are based on the performance of discretionary functions within the meaning of § 2680(a). See, e.g., Medina v. United States, 259 F.3d 220, 224–26 (4th Cir. 2001); Gasho v. United States, 39 F.3d 1420, 1435 (9th Cir. 1994); Garcia v. United States, 826 F.2d 806, 809 (9th Cir. 1987); Pooler v. United States, 787 F.2d 868, 871–72 (3d Cir. 1986); Gray v. Bell, 712 F.2d 490, 508 (D.C. Cir. 1983); Caban v. United States, 671 F.2d 1230, 1234–35 (2d Cir. 1982).

Some of those decisions have tried to avoid making the subsection (h) proviso meaningless by defining "discretionary" in subsection (a) so narrowly that it excludes most of the actions of rank and file federal law enforcement officers that lead to subsection (h) proviso claims. See Garcia, 826 F.2d at 809 ("While law enforcement involves exercise of a certain amount of discretion on the part of individual officers, such decisions do not involve the sort of generalized social, economic and political policy choices that Congress intended to exempt from tort liability."); Pooler, 787 F.2d at 872 ("Reading the intentional tort proviso as limited to activities in the course of a search, a seizure or an arrest as a practical matter largely eliminates the likelihood of any overlap between

27

section 2680(a) and section 2680(h)."); Gray, 712 F.2d at 508 ("[I]f the 'investigative or law enforcement officer' limitation in section 2680(h) is read to include primarily persons (such as police officers) whose jobs do not typically include discretionary functions, it will be rare that a suit permissible under the proviso to section 2680(h) is barred by section 2680(a)"); Caban, 671 F.2d at 1234–35 (holding that INS officers' decisions about whether to detain an alien did not constitute a discretionary function under the FTCA and that sovereign immunity did not bar the lawsuit). We recognize that every one of those decisions would reach the same result that we do in this case because Dr. Nguyen's claims arise from acts or omissions of Agent Yakubec that those other circuits would define as non-discretionary.

Still, we are not persuaded to follow their approach. None of those other decisions addresses the war between the "anys" in § 2680 (a) and (h). None of them applies the canons of statutory construction under which a more specific and more recently enacted provision trumps a more general and earlier one. None of them comes to grips with the clear congressional purpose behind the enactment of the proviso to subsection (h). None of them persuades us to abandon our conclusion that if a claim is one of those listed in the proviso to subsection (h), there is no need to determine if the acts giving rise to it involve a discretionary

function; sovereign immunity is waived in any event.

## V.

Having laid out the law as we would decide it if we were writing on a clean slate, we turn now to whether there is anything on the precedential slate preventing us from making our conclusion a holding. There are no Supreme Court decisions instructing us about the relationship between § 2680(a) and the proviso to subsection (h). We are, of course, bound to follow prior panel precedent that is on point. There are only two decisions of our Court that arguably address the issue of sovereign immunity for any claim listed in the proviso to subsection (h) stemming from acts or omissions of federal investigative or law enforcement officers.[4] Neither reached a holding contrary to our conclusion.

The first of those two decisions is Brown v. United States, 653 F.2d 196 (5th Cir. Unit A Aug. 1981).[5] It did involve a claim, malicious prosecution, that is

---

[4] Seibert v. Baptist, 594 F.2d 423 (5th Cir. 1979), is not such a decision because the claims in that case arose two years before the effective date of the § 2680(h) proviso, and it involved § 2680(c). Id. at 425–28. Nor is Mesa v. United States, 123 F.3d 1435 (11th Cir. 1997), which involved only negligence claims and in which we specifically refused to speculate about what might have happened if the plaintiffs had pursued claims based on the causes of action set forth in § 2680(h). Id. at 1437 n.3, 1439 n.5. Nor is Mid-South Holding Co. v. United States, 225 F.3d 1201 (11th Cir. 2000), which involved a claim about negligence in carrying out a search instead of any of the intentional tort claims listed in the § 2680(h) proviso. Id. at 1202, 1205.

[5] In our en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. The preexisting Fifth Circuit precedent that the Bonner decision

29

listed in the § 2680(h) proviso, but we had no occasion to decide anything about the interaction of the proviso and subsection (a) in <u>Brown</u> because sovereign immunity applied regardless. It applied regardless of subsections (a) and (h) because § 1346(b) itself provides that sovereign immunity is waived only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The pivotal fact in <u>Brown</u> was that there was no malice and as a result the malicious prosecution claim was not valid under the law of Texas, which is the place where the acts occurred. 653 F.2d at 199–201. There was, therefore, no occasion to decide what effect § 2680(a) or (h) would have had if there were a valid malicious prosecution claim. <u>See</u> <u>id.</u> at 201–02 ("We leave for another day the question of whether . . . a constitutional tort action 'arising out of' one of Section 2680(h)'s six enumerated torts is viable under the Act if sanctioned by 'the law of the place.'").

The other post-proviso decision of our Court addressing the issue of sovereign immunity in a lawsuit asserting some of the six claims listed in the proviso to § 2680(h) is <u>Adras v. Nelson</u>, 917 F.2d 1552 (11th Cir. 1990). That

adopted as binding precedent in this circuit includes all Unit A panel decisions issued before October 1, 1981. <u>United States v. Todd</u>, 108 F.3d 1329, 1333 n.5 (11th Cir. 1997).

30

case involved allegations that INS officials had unlawfully detained black Haitian refugees and discriminated against them on the grounds of national origin and race. Id. at 1553. The plaintiffs, who were excludable aliens,[6] brought a large number of claims under the FTCA including ones for abuse of process and false imprisonment, which are two of the claims listed in the § 2680(h) proviso. Id. at 1555. We held that the claims were barred by sovereign immunity because they "ar[o]se from the exercise or the performance of a discretionary function on the part of the government and its agents and . . . the defendants are shielded from liability by the provisions of Section 2680(a)." Id.

Under the facts of the Adras case, and specifically in the context of immigration and the rights of excludable aliens, we reasoned that the claims were a direct attack on a discretionary decision by the Attorney General because he had weighed policy considerations in deciding to withhold parole for excludable aliens. Id. at 1556 ("[T]he Attorney General is under no obligation to parole excludable aliens—he may do so in his discretion." (emphasis and quotation marks omitted)). We explained that:

> Excludable aliens cannot challenge the decisions of executive
> officials with regard to their applications for admission, asylum, or

---

[6] "[E]xcludable aliens are those who seek admission into the United States but have not achieved entry." Adras, 917 F.2d at 1555.

31

parole on the basis of the rights guaranteed by the United States Constitution. They do have rights, however, to whatever process Congress—and through its regulations and established policies, the Executive Branch—have extended them.

Id. at 1554.

The § 2680(h) proviso was not even mentioned in the Adras decision. The reason probably is that the lawsuit does not appear to have been brought because of "acts or omissions of investigative or law enforcement officers of the United States," and if it was not brought because of acts or omissions of those specific types of officers, the proviso did not apply. See 28 U.S.C. § 2680(h). The term "investigative or law enforcement officer" is defined in the proviso to mean "any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." Id. The Adras lawsuit was brought against officials of the Immigration and Naturalization Service responsible for the policy that resulted in detention of the excludable alien plaintiffs and apparently not against rank and file investigative and law enforcement officers. See 917 F.2d at 1553. According to the docket sheet in the Adras case the following INS officials were listed as defendants: Alan C. Nelson, Commissioner of Immigration and Naturalization Service; Doris Meissner, former Acting Commissioner, INS; David Crosland, former General Counsel and former

32

Acting Commissioner, INS; Hugh J. Brien, former Acting Associate Commissioner of INS for Enforcement; Joe Howerton, former District Director District VI, INS; Leonard Rowland, Assistant District Director, Detention and Deportation; District VI, INS; the United States; the INS; and John Does I–XXV.[7] See Adras v. Nelson, No. 85-0197-CIV-Scott (S.D. Fla. March 14, 1989).

Even if some of the John Doe defendants in the Adras case had been working investigative or law enforcement officers—and there is no indication that they were—the decision in that case would not control this one. Regardless of who the defendants were and how the claims were cast in that case, the plaintiffs' grievances were not with the agents who had ministerially carried out the Attorney General's detention policy but with the Attorney General and other high ranking officials who were responsible for the existence of that policy. Cf. Jean v. Nelson, 727 F.2d 957, 967 (11th Cir. 1984) ("[A]s a result of the existence of inherent executive power over immigration and the broad delegations of discretionary authority in the INA, the separation-of-powers doctrine places few restrictions on executive officials in dealing with aliens who come to this country in search of admission or asylum."). The district court explained that the allegations in the

---

[7] We take judicial notice of the docket sheet in Adras in order to determine the identity of the defendants in that case. See United States v. Glover, 179 F.3d 1300, 1302 n.5 (11th Cir. 1999) ("A court may take judicial notice of its own records and the records of inferior courts.").

33

plaintiffs' complaint were based "on Defendants' initiating, planning, supervising, coordinating, and preparing the detention policy and subsequent detention of Plaintiffs." See No. 85-0197-CIV-Scott at 6. The Attorney General, not any local INS agent, was the source of the policy about which the plaintiffs complained. See Adras, 917 F.2d at 1556 ("The district court noted that '[p]laintiffs were detained as a result of the Attorney General's order requiring INS officials to hold without parole all aliens unable to establish a prima facie case for admission.'" (citations omitted)).

Even if the Attorney General does fit within the definition of "investigative or law enforcement officer" contained in the last sentence of the § 2680(h) proviso, [8] the Adras decision extends no further than the facts of that case. See Watts v. BellSouth Telecomms., Inc., 316 F.3d 1203, 1207 (11th Cir. 2003) ("[J]udicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."). The central fact that defines the Adras decision and limits its scope is that the claims arose not from an investigative or law enforcement officer's decision to search or arrest or charge in a particular case but

---

[8] The Attorney General has very broad authority and is empowered to perform all the functions that anyone in the Department of Justice is authorized to perform except for three specifically listed functions that have no application here. See 28 U.S.C. § 509 (providing that "[a]ll functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General" except three listed functions).

from a general policy decision made in the exercise of his discretion by a high official in the Executive branch. See 917 F.2d at 1556.

At least where the special circumstances present in the Adras case do not exist, and the § 2680(h) proviso applies to waive sovereign immunity, the exception to waiver contained in § 2680(a) is of no effect. To the extent of any conflict, the later enacted and more specific subsection (h) proviso trumps the earlier and more general subsection (a), as Congress clearly intended that it would.

## VI.

Dr. Nguyen has brought claims for false imprisonment, false arrest, and malicious prosecution arising out of the acts or omissions of Agent Yakubec. At the time of the acts in question, Agent Yakubec was a federal investigative or law enforcement officer, defined in the statute as one "empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." See 28 U.S.C. § 2680(h). Under the facts and circumstances as alleged, Dr. Nguyen's claims against the United States are expressly permitted by the plain language of the proviso to § 2680(h). Therefore, the district court should not have granted the United States' motion to dismiss on sovereign immunity grounds.

**REVERSED.**