**Ramon GARCIA; Maria Morfin Garcia,**
**Plaintiffs-Appellees,**

v.

**UNITED STATES of America, U.S.**
**Dept. of Justice & I & NS,**
**Defendant-Appellant.**

**No. 86–2645.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 12, 1987.

Memorandum July 28, 1987.

Opinion Sept. 2, 1987.

Arthur G. Newman, Jr., Phoenix, Ariz., for plaintiffs-appellees.

Before GOODWIN, BEEZER and THOMPSON, Circuit Judges.

BEEZER, Circuit Judge:

The memorandum disposition filed July 28, 1987, is redesignated as an authored opinion by Judge Beezer. See the attached opinion.

## OPINION

The United States appeals from judgment assessing liability under the Federal Tort Claims Act (FTCA) for damages to Ramon and Maria Garcia. Ramon Garcia, a citizen of Mexico, was shot when he threatened Walter Hummel, a border patrol agent of the Immigration and Naturalization Service, with a stick and rock in an effort to compel Hummel to release a prisoner Hummel arrested on United States soil. Because Hummel did not forfeit his right to self defense, we reverse the judgment.

### I

### *Background*

On the evening of December 14, 1982, a group of Mexican citizens, including plaintiff Ramon Garcia, gathered on the west side of the Colorado River near Morelos Dam for the purpose of crossing without inspection into the United States. They were waiting for dark in order to cross the river undetected. The Colorado River flows north to south at Morelos Dam, with Mexico to the west side of the river and the United States to the east.[1]

Two fishermen parked their truck at the dam and walked approximately 100 yards away for the purpose of fishing. Agent Hummel testified that he observed a teen-

---

Marc Richman, Washington, D.C., for defendant-appellant.

1. Morelos Dam, although owned and operated by Mexico, lies almost entirely in the United States. The parties agree that all events in this case occurred in the United States.

age boy of Mexican appearance acting suspiciously near the fishermen's truck.[2]

Hummel, who wore a border patrol uniform, sought to stop and question the teenager, but the teenager fled on foot towards Mexico. Hummel drove his marked border patrol vehicle to the west in order to prevent the teenager from returning to Mexico.[3] Although the teenager was slightly over 5 feet tall and weighed only 140 pounds, he violently resisted 220–pound Hummel's attempts to detain him. Hummel and the teenager fought both standing and on the ground. The teenager broke away on several occasions, only to be recaptured. At one point, approximately 10 to 20 minutes before Garcia was shot, Hummel drew his revolver and fired a warning shot in an attempt to stop the teenager. When Hummel finally caught the teenager, Hummel threw him to the ground and held him there while handcuffing him.

The warning shot drew the attention of other witnesses, including the group of 15 to 30 Mexicans. As the Mexicans observed the chase and scuffle, they became extremely agitated. They believed that Hummel had crossed into Mexican territory[4] and demanded that Hummel release the teenager. Hummel refused, warning the Mexicans (in English) that they were in the United States and (in Spanish) that Mexico was "over there." The Mexicans continued to demand the teenager's release and threatened to kill Hummel. While Hummel continued to struggle with the handcuffed teenager, one of the fishermen drove the border patrol vehicle to Hummel so that the teenager could be placed inside.

The Mexicans left the levee from which they were watching and approached Hummel. A group of 5 to 7 Mexicans, armed with rocks and sticks, led, while the remainder followed behind, shouting and demanding the teenager's release. Garcia was in the first group, carrying a stick in one hand and a rock in the other. As Garcia approached, Hummel partially kneeled on the teenager next to the border patrol vehicle. Garcia drew closer, brandishing the stick and rock with upraised arms. When Garcia was 3 to 5 feet away, Hummel rose and shot him in the abdomen.

## District Court Decision

After a bench trial, the district court held that Hummel was wantonly negligent in

1) the manner in which he attempted to detain and detained the teenager;

2) firing the warning shot at or near the teenager;

3) treatment of the teenager during and following detention;

4) failing to release the teenager "who, at best, could be found to have [committed] a minor misdemeanor 'turnstile' offense;"

5) failing to follow Border Patrol Manual guidelines with respect to youths; and

6) creating "a dangerous situation which was likely to result in serious injury or death to Agent Hummel, the boy or some other innocent person."

The court held that Hummel "in effect, incited the Mexican citizens to riot" and that Garcia's assault was a foreseeable consequence of Hummel's wanton negligence. The court held that Garcia was not contributorily negligent and that Hummel forfeited his right of self defense by using excessive force to arrest the teenager and provoking Garcia's attack.[5] The United States appeals.[6]

---

2. The district court found that Hummel "elaborated" his story in several respects. The extent of elaboration is unclear.

3. The district court found that Mexico was the teenager's "obvious homeland."

4. The district court determined that the location of the border was unclear to laymen and that the Mexicans' belief was reasonable, albeit mistaken.

5. The precise basis of the district court's holding is unclear: the court apparently determined that Hummel provoked Garcia's assault because the arrest was illegal and because Hummel used excessive force to effect the arrest.

6. The damages phase of the trial was conducted separately. The government appeals only liability.

## II

### Jurisdiction

The district court had jurisdiction under 28 U.S.C. § 1346. This Court has jurisdiction under 28 U.S.C. § 1291.

The United States claims that the district court lacked jurisdiction because Hummel's actions were all discretionary within the meaning of the discretionary function exception to the FTCA. 28 U.S.C. § 2680.[7]

■ Federal courts do not have subject matter jurisdiction over tort actions based on federal defendants' performance of discretionary functions. *Cunningham v. United States*, 786 F.2d 1445, 1446 (9th Cir.1986). Whether a particular activity is a discretionary function is a question of law, which this Court reviews *de novo*. *See United States v. McConney*, 728 F.2d 1195 (9th Cir.), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

Government action is discretionary if the action is "of the nature and quality that Congress intended to shield from tort liability." *Begay v. United States*, 768 F.2d 1059, 1064 (9th Cir.1985), *quoting United States v. S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines )*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). "Congress wished to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig*, 467 U.S. at 814, 104 S.Ct. at 2765; *see Cunningham*, 786 F.2d at 1447.

■ While law enforcement involves exercise of a certain amount of discretion on the part of individual officers, such decisions do not involve the sort of generalized social, economic and political policy choices that Congress intended to exempt from tort liability. *See Caban v. United States*, 671 F.2d 1230 (2d Cir.1982) (INS decision whether to detain alien based on alien's appearance and ability to answer questions about his homeland not a discretionary function under FTCA). The district court had subject matter jurisdiction over this action.

## III

### Analysis

The FTCA provides that the government "shall be liable ... in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. Liability is to be determined "in accordance with the law of the place where the [wrongful] act or omission occurred." 28 U.S.C. § 1346. All events in this case occurred in Arizona. Accordingly, Arizona law determines whether the United States is liable for Garcia's injuries. *See Shaw v. United States*, 741 F.2d 1202, 1205 (9th Cir.1984).

■ Garcia advanced three theories of liability at trial: assault, battery and negligence. The district court held that Hummel was negligent in a variety of respects (see supra), and awarded damages on the basis of negligence. We have grave doubts concerning the district court's findings and conclusions regarding negligence.[8] However, the record indicates that Garcia established prima facie assault and battery under Arizona tort law.[9] We do not decide

---

7. Title 28, United States Code § 2680 provides that the Federal Tort Claims Act shall not apply to

   (A) Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government

   ....

8. The district court's holding that Hummel had a duty to *release* his prisoner in the face of an angry mob is particularly troubling. We also question the district court's finding of proximate cause. Although an intentional act of a third party does not as a matter of law constitute a superseding cause where the injured party is an innocent bystander, *Parness v. City of Tempe*, 123 Ariz. 460, 600 P.2d 764, (App.1979), we doubt that public policy could condone a rule that rewards one whose *own* intentional and wrongful interference in dangerous situations causes him injury.

9. A person commits the tort of assault if he acts with intent to cause another harmful or offensive contact or apprehension thereof, and the other person apprehends imminent contact. *See Restatement, Second, Torts,* § 21. A person commits battery if he acts with intent to cause

whether Garcia established a prima facie case of negligence because we must, in any event, address the issue of self defense respecting Garcia's assault and battery claims. We now turn to the issue of self defense.

Chapter 4 of the Arizona Criminal Code sets forth conditions under which use of physical or deadly force against another may be legally justified. *See* ARS § 13-401 et seq. Section 13-413 provides that

No person in this state shall be subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions of this chapter.

Under this provision, the United States may not be held liable if Hummel was justified in shooting Garcia, even if Hummel was negligent and his negligence proximately caused Garcia's injury. *Cf. Young v. City of Killeen,* 775 F.2d 1349 (5th Cir. 1985) (Officer liable under Texas wrongful death law for legally justified shooting).

### A. *Arizona Statutes Governing Self Defense and Defense of Others*

Because this case turns on application of complex and interrelated self defense statutes, we set them forth here in some detail.

ARS § **13-404** provides as follows:
Justification; self-defense
A. [A] person is justified in threatening or using physical force against another when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force.
B. The threat or use of physical force against another is not justified:

. . . . .

2. To resist an arrest that the person knows or should know is being made by a peace officer or by a person acting in a peace officer's presence and at his direction, *whether the arrest is lawful or unlawful, unless the physical force used by the peace officer exceeds that allowed by law;* or

harmful or offensive contact, or apprehension thereof, and the contact occurs. *See id.* § 18.

3. If the person provoked the other's use or attempted use of unlawful physical force

. . . .

ARS § 13-404 (emphasis added).

ARS § **13-405** provides that threat or use of deadly force is justified where physical force is justified under § 13-404 *and* "when a reasonable person would believe that deadly physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly physical force."

The district court found that the situation was "likely to result in serious injury or death" to Agent Hummel. Under these circumstances, Hummel's use of deadly force against Garcia was justified unless 1) Hummel used or attempted to use unlawful deadly force to arrest the teenager (ARS §§ 13-404 B.2., 13-405), or 2) Hummel provoked Garcia's assault (ARS § 13-404 B.3.). We consider first whether Hummel used unlawful deadly force to effect the arrest.

### B. *Use of Unlawful Deadly Force to Arrest the Teenager*

Whether the teenager was in danger of death or serious bodily injury is a question of fact, which we review for clear error. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); *see also Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

The district court held that Hummel created "a dangerous situation which was likely to result in serious injury or death to ... the boy...." We read this statement as a finding that Hummel threatened the teenager with death or serious bodily injury. This finding is clearly erroneous.[10]

10. The parties raise several matters *not* relevant to determination of whether Hummel forfeited

## 1. The Warning Shot

■ Hummel fired a warning shot 10–20 minutes before the final encounter with Garcia. A warning shot itself is not deadly force. *Bell v. City of Milwaukee,* 746 F.2d 1205, 1279 & n. 89 (7th Cir.1984); *see* La-Fave & Scott, *Handbook on Criminal Law,* 392 (1972). Of course, a warning shot may constitute a *threat* to use deadly force such that a reasonable person might be justified in returning fire. *See* ARS § 13–405.[11]

ARS § 13–405 permits use of deadly force only when a person reasonably believes that deadly force "is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly physical force." The record amply supports the district court's finding that Hummel was in imminent danger of death or serious injury.

The district court's finding that the teenager was in danger of death or serious injury lacks support. Only Garcia testified that the teenager was in danger of death or serious bodily injury. Garcia's testimony on this point was inconsistent. In general, the district court did not find Garcia's testimony credible. By contrast, the witnesses whom the district court found most credible all testified that the teenager was in no danger of injury at all, let alone death or serious bodily injury.[12] The district court's finding that the teenager was in danger of death or serious bodily injury contradicts the district court's own credibility findings. The finding that the teenager was in danger of death or serious bodily injury is clearly erroneous.[13]

his right of self defense by using unlawful deadly force against the teenager.

First, legality of the arrest is not relevant to whether the shooting in this case was justified because 1) Arizona law does not permit suspects (or others) to use force to resist illegal arrests (ARS § 13–404), and 2) the Fourth Amendment prohibits use of deadly force to apprehend nondangerous suspects even in legal arrests. *Tennessee v. Garner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (*Garner*). Regardless of whether Hummel had sufficient grounds to arrest the teenager, any use or attempted use of deadly force to arrest the teenager would have been unlawful because the teenager was not a dangerous suspect.

Second, whether Hummel forfeited his right of self defense does not depend on whether Garcia or the teenager were legally justified in using deadly force against Hummel. Arizona law permits a person to use deadly force to resist an arrest effected with excessive force if, "under the circumstances as a reasonable person would believe them to be," deadly force is immediately necessary to protect the suspect against use or attempted use of unlawful deadly force. ARS §§ 13–405, 13–404 B.2., 13–406; *see State v. Martinez,* 122 Ariz. 596, 596 P.2d 734, 736 (App.1979). These provisions do not limit the arresting officer's right to self-defense. Rather, they exonerate from liability persons who are reasonably mistaken as to the degree of danger faced by themselves or the person they attempt to rescue. Hummel did not forfeit his right to self defense if Garcia reasonably, but mistakenly believed that the teenager was in danger of death or serious injury. Only if Hummel *actually* used or attempted to use deadly force against the teenager did Hummel forfeit his right to defend himself against a deadly attack.

Third, we need not consider whether Hummel used excessive *non* deadly force to arrest the teenager because use of excessive nondeadly force does not vitiate an officer's right to defend against deadly attack.

Fourth, we need not consider whether Hummel would have been justified in using deadly force to arrest the teenager because, as discussed *infra,* he did not use such force to arrest the teenager. *Cf. Gardner,* 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) (officer shot and killed nondangerous suspect).

**11.** Arizona law authorizing use of force in law enforcement neither authorizes nor prohibits threat of deadly force in effecting a misdemeanor arrest. *See* ARS § 13–410. However, the Border Patrol Manual prohibits use of warning shots in misdemeanor arrests, and the government concedes that Hummel's use of a warning shot to frighten the teenager was improper. For purposes of this disposition, we assume that the warning shot was excessive (but not deadly) force.

**12.** The district court found that the two fishermen, Whitby and Bienenfeld, were "totally unbiased and probably the most reliable witnesses in the case" and that Guzman had "no reason to color his story."

**13.** Even if the warning shot constituted an attempt to use deadly force against the teenager, Hummel did not attempt or even threaten to use deadly force at the time of Garcia's assault. Ten to twenty minutes elapsed between the time Hummel fired the warning shot and the time the Mexicans approached Hummel. Garcia himself never saw Hummel's pistol unholstered. As discussed above, those witnesses whom the district court considered most credible thought

### 2. Use Of Deadly Force Against Garcia As Excessive Force To Arrest The Teenager

■ The district court apparently considered Hummel's shooting of Garcia an act in furtherance of the arrest of the teenager. This simply misstates the facts. Hummel shot Garcia to protect his own life, not to perfect the arrest of the teenager. Indeed, the teenager escaped immediately when Hummel stood to shoot Garcia.

Plaintiffs rely on *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) for the proposition that Hummel was required to release the teenager before using deadly force against Garcia. In *Garner*, the Supreme Court held that use of deadly force to apprehend a fleeing, nondangerous suspect violated the victim's Fourth Amendment rights. This case differs from *Garner* in significant respects.

First, Hummel's purpose was to arrest the teenager, not Garcia. The officer in *Garner* used deadly force to stop the suspect he sought to arrest in the first instance. Of course, shooting Garcia constituted a seizure under the Fourth Amendment. *See Garner*, 471 U.S. at 7, 105 S.Ct. at 1699. However, the basis for this seizure was not the teenager's alienage or resistance to arrest, but rather Garcia's felonious and deadly assault on Hummel—a crime which Hummel had probable cause to believe "pose[d] a threat of serious physical harm" to himself.[14] *Garner*, 471 U.S. at 11, 105 S.Ct. at 1701.

Second, unlike Garcia, the suspect in *Garner* did not threaten the arresting officer in any way and the officer was "reason-

ably sure" that the suspect was unarmed. 471 U.S. at 3, 21, 105 S.Ct. at 1697, 1706.

The district court's interpretation of *Garner* would require law enforcement officials to release nondangerous prisoners before defending themselves against assaults of bystanders who are armed and dangerous. Neither precedent nor common sense supports such a proposition. The district court's finding that the teenager was in danger of death or serious bodily injury is clearly erroneous.

### C. *Provocation*

We next consider whether the record supports the district court's determination that Hummel provoked Garcia into a deadly assault. The question of what sort of conduct constitutes provocation under Arizona law is a question of law, which we review *de novo*. *Matter of McLinn*, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc). The district court applied the incorrect legal standard of provocation to determine whether Hummel provoked Garcia's assault.

■ One who provokes another's use of force may not assert self defense, even if the other's use of force is unlawful. *State v. Williams*, 132 Ariz. 153, 644 P.2d 889 (1982). "Before an act may cause forfeiture of the fundamental right of self-defense, it must be *willingly and knowingly calculated to lead to such conflict.*" *State v. Jackson*, 94 Ariz. 117, 382 P.2d 229, 232 (1963) (emphasis added). Unintentional acts (e.g., reckless, negligent, wantonly negligent) do not constitute provocation.[15]

the teenager was in no danger of death or serious bodily injury.

**14.** The district court held that Hummel could have avoided injury to himself or others by releasing the teenager. Even if the court was correct, liability cannot rest upon such an exercise in "20–20 hindsight." As Justice Holmes observed, "[d]etached reflection cannot be demanded in the presence of an uplifted knife." *Brown v. United States,* 256 U.S. 335, 343, 41 S.Ct. 501, 502, 65 L.Ed. 1 (1921); *see also* ARS § 13–405 (deadly force justified "When and to the degree a reasonable person would believe" that such force is necessary to repel an unlawful deadly attack); ARS § 13–410 (use of deadly

force by arresting officer justified "only if a reasonable person effecting the arrest ... would believe the suspect ... is ... [a]ctually resisting the discharge of a legal duty with deadly physical force or with the apparent capacity to use deadly physical force.")

**15.** We are aware of no case in which Arizona courts have held that negligence, wanton or otherwise, constitutes provocation for purposes of self defense. *See State v. Noriega,* 142 Ariz. 474, 690 P.2d 775 (1984); *Gortarez v. Smitty's Super Valu, Inc.,* 140 Ariz. 97, 680 P.2d 807 (1984); *State v. Bojorquez,* 138 Ariz. 495, 675 P.2d 1314 (1984); *State v. Lujan,* 136 Ariz. 102, 664 P.2d 646, 649 (1983); *State v. Celaya,* 135

In *Jackson,* the Arizona Supreme Court held that defendant did not forfeit his right to self defense by returning, armed, to the scene of an earlier altercation with the victim, even though the victim had threatened twice to shoot defendant, defendant knew of victim's reputation for violence, and defendant knew that victim carried a pistol. *Id.* at 231–32.

> The act of returning to the clubroom [did not forfeit defendant's right to self-defense] unless it was ... deliberately calculated to lead to further conflict.... On[e] who merely does an act which affords an opportunity for conflict is not thereby precluded from claiming self-defense. Fault implies misconduct not lack of judgment.

*Id.* at 232 (citations omitted).

The district court held that Hummel was "wantonly negligent" in a variety of respects. The government concedes that Hummel acted improperly in firing the warning shot. However, nothing in the record or the district court opinion suggests that Hummel willingly or knowingly calculated his actions to goad Garcia and the Mexicans into a deadly assault. Hummel was not even aware of the Mexicans before he fired the warning shot. Once Hummel became aware of the Mexicans, he attempted to avoid confrontation, telling them to back off and warning them that they were in the United States and that Mexico was "over there."

If Hummel intentionally provoked anyone to unlawful violence, he provoked only the teenager, not unrelated bystanders. We are aware of no case in which Arizona courts have held that provocation extends vicariously to would-be rescuers. We decline to endorse such an extension here.

■ The only reason Garcia had for coming to the teenager's aid was Garcia's erroneous (albeit reasonable) belief that Hummel had chased the teenager into Mexico. However, Garcia's and the Mexicans' belief regarding the location of the border is not relevant to whether Hummel forfeited his right of self defense. The incident occurred in the United States and the State of Arizona. Federal law, incorporating Arizona law, governs this case. Garcia's belief, however reasonable, that Hummel intruded into Mexico cannot qualify or diminish Hummel's right to defend himself from attack. See supra n. 10, ¶ 3.

Garcia first became aware of the struggle when Hummel fired the warning shot. Garcia did not know 1) whether Hummel had legal justification to arrest the teenager, or 2) the gravity of the offense for which Hummel sought to arrest the teenager. For all Garcia knew, the teenager had committed dangerous felonies in Hummel's presence. From Garcia's perspective, Hummel's apparent intrusion on foreign soil to effect what (as far as Garcia was concerned) appeared to be a lawful arrest was not an act sufficient to provoke Garcia's deadly attack.

■ The district court held that Hummel's *negligent* conduct provoked Garcia. Negligence, wanton or otherwise, does not, as a matter of law, constitute provocation under Arizona self defense statutes.

### Conclusion

The district court's finding that the teenager was in danger of death or serious bodily injury at the time of Garcia's assault is clearly erroneous. The district court erred in holding that Hummel's negligence abrogated his right to defend himself. Because Hummel's actions were not willingly

Ariz. 248, 660 P.2d 849 (1983); *State v. Williams,* 132 Ariz. 153, 644 P.2d 889, 892 (1982); *State v. Wilson,* 113 Ariz. 363, 555 P.2d 321 (1976); *State v. Moore,* 112 Ariz. 271, 540 P.2d 1252 (1975); *State v. Schantz,* 102 Ariz. 212, 427 P.2d 530 (1967); *State v. King,* 99 Ariz. 145, 407 P.2d 101 (1965); *State v. Jones,* 95 Ariz. 4, 385 P.2d 1019 (1963); *State v. Randall,* 94 Ariz. 417, 385 P.2d 709, 710 (1963); *State v. Myers,* 59 Ariz. 200, 125 P.2d 441 (1942); *Macias v. State,* 6 P.2d 423 (1931); *State v. Kelly,* 149 Ariz. 115, 716 P.2d 1052 (App.1986); *State v. Zamora,* 140 Ariz. 338, 681 P.2d 921 (App.1984); *State v. Moya,* 138 Ariz. 7, 672 P.2d 959 (App. 1983); *State v. Islas,* 132 Ariz. 590, 647 P.2d 1188, 1190 (App.1982); *State v. Sourivathong,* 130 Ariz. 461, 636 P.2d 1243, 1244 (App.1981); *State v. Birdsall,* 116 Ariz. 196, 568 P.2d 1094 (App.1977).

or knowingly calculated to cause Garcia to threaten him with deadly force, he did not provoke Garcia's attack. Accordingly, Hummel did not forfeit his right to self defense.

The judgment is REVERSED.