**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LYDIA MARQUEZ, on behalf of
herself as and on behalf of the
statutory beneficiaries of Ronald
Marquez, deceased; EDWARD
MARQUEZ, an individual; CHELSEA
RONEE DOCTOLERO, an individual;
RONALD MARQUEZ, Jr., an
individual; CYNTHIA CARINA
MARQUEZ, an individual; MARIO
RICO AHUMADA, an individual,
        *Plaintiffs-Appellants,*

       v.

CITY OF PHOENIX, a municipality
organized under the laws of the
State of Arizona; DAVID GULIANO,
in his individual capacity as an
officer with the City of Phoenix
Police Department; JOSHUA ROPER,
in his individual capacity as an
officer with the City of Phoenix
Police Department; TASER
INTERNATIONAL, INC., a Delaware
corporation,
        *Defendants-Appellees.*

No. 10-17156

D.C. No.
2:08-cv-01132-
NVW

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Arizona
Neil V. Wake, District Judge, Presiding

Argued and Submitted
April 17, 2012—San Francisco, California

12011

Filed September 11, 2012
Amended October 4, 2012

Before: Mary M. Schroeder, Diarmuid F. O'Scannlain, and
Susan P. Graber, Circuit Judges.

Opinion by Judge O'Scannlain;
Dissent by Judge Schroeder

**COUNSEL**

G. Lynn Shumway, Law Office of G. Lynn Shumway, Phoenix, Arizona, argued the cause and filed the briefs for the individual appellants, Mario Rico Ahumada, Chelsea Ronee Doctolero, Cynthia Marquez, Edward Marquez, and Ronald

Marquez, Jr. as well as for appellant Lydia Marquez, as an individual and as the personal representative of Ronald Marquez and the Estate of Ronald Marquez.

Nicholas D. Acedo, Jones, Skelton & Hochuli, P.L.C., Chandler, Arizona, argued the cause and filed the brief for the individual appellees, Officer David Guliano and Officer Joshua Roper, and for the municipal appellee, the City of Phoenix. With him on the brief was Kathleen L. Wieneke, Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona.

Pamela B. Petersen, Law Office of Pamela B. Petersen, Peoria, Arizona, argued the cause and filed the brief for appellee, TASER International, Inc. With her on the brief were Holly L. Gibeaut and Michael Brave, TASER International, Inc., Scottsdale, Arizona.

---

## ORDER

The dissenting opinion filed in this case on September 11, 2012, slip opinion page 11039, is hereby amended as follows:

On slip opinion page 11062, delete the word "healthy" in the parenthetical in the second paragraph. With this amendment, the panel has voted to deny the motion to reconsider the dissent and deny the petition for panel rehearing.

The motion to reconsider the dissent and petition for panel rehearing is DENIED. No further petitions for panel rehearing or for rehearing en banc will be entertained.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We consider whether a police officer has used constitutionally excessive force by repeatedly deploying an electronic control device—commonly known as a "taser"—against a combative suspect and whether the manufacturer of that device has provided sufficient warning that its repeated use may lead to death.

I

A

Early in the morning of July 28, 2007, Lydia Marquez was roused from her sleep by the sounds of "yelling . . . and cussing" coming from a spare bedroom in her Phoenix, Arizona, home. Inside were her son Ronald, her granddaughter Cynthia, and her great-granddaughter Destiny. A few days earlier, Cynthia had suffered a head injury in a car accident, causing her to make odd statements about her relationships with God and the devil. Concerned about what was happening, Lydia knocked on the bedroom door. When the screaming stopped, she returned to sleep. Shortly thereafter, Lydia awoke again to sounds of "praying and yelling." Sensing that there was "something wrong, something bad going on," Lydia went to the nearby home of a relative and called the police.

Officer Joshua Roper was the first to arrive. He began to gather details from members of the Marquez family while he waited outside the home for Officer David Guliano, who was en route. The officers learned that Ronald was attempting to perform an exorcism on three-year-old Destiny, but that (so far as his relatives knew) he had no weapons. The officers radioed for instructions, but after they heard "a little girl screaming and crying like she [was] in severe pain or something [was] torturing her," they decided they could not wait.

With Lydia's assistance, the officers entered the house and proceeded to the bedroom door. The screaming continued. Officer Roper drew his TASER X26 ECD ("X26"), an electronic control device manufactured by defendant-appellee TASER International, Inc. ("TASER");[1] Officer Guliano drew his service pistol. At the door, they identified themselves as police officers. The shouting intensified until the officers could no longer hear Destiny. Concerned for the child's safety, the officers decided to enter the bedroom but were unable to open the door because a bed had been shoved in front of the aperture. Using their combined body weight, the men were eventually able to force the door partially open at an angle. Roper, who was taller, clambered into the room through this gap.

He was greeted by chaos. The relatively small bedroom was cluttered with two beds, a dresser, and a large TV stand. The walls and furniture were smeared with blood. A malfunctioning air conditioning unit left the room sweltering. Shirtless, the heavy-set Ronald reclined on the larger bed with the now silent and motionless Destiny in a choke-hold, his hands hidden. Cynthia—who at 19 was quite a large woman—was naked in the corner screaming. Her face showed evidence of a recent beating. It was later discovered that Ronald had gouged her eye in an attempt to exorcize her demons.

Officer Roper ordered Ronald to "[l]et go of the child or I'm going to tase you." When Ronald did not comply, Roper deployed the X26 in "probe mode." Two darts shot from the front of the X26 and lodged in Ronald's left side. If it had performed as intended, the X26 would have incapacitated Ronald by overriding his central nervous system through a series of electrical pulses. But the X26 functions properly in this mode

---

[1]TASER is an acronym for "Thomas A. Swift's Electric Rifle." *See* Jeffrey D. Ho, et al., *Absence of Electrocardiographic Change After Prolonged Application of a Conducted Electrical Weapon in Physically Exhausted Adults*, 41 J. Emergency Med. 466, 469 (2009).

only if the darts are separated by at least four inches. This would have required Roper to have been standing at least seven feet from Ronald, but the cramped conditions in the bedroom made that impossible. As a result, the X26 did not appear to affect Ronald as intended. Nevertheless, Roper pulled the trigger a second time. When this discharge also appeared not to work, Roper removed the cartridge and tested the X26 to see if it was functioning. While he was doing so, Officer Guliano—who had not yet been able fully to enter the room—extracted Destiny through the partially open door. He passed her into the arms of a waiting relative before joining Officer Roper inside the bedroom.

At this point, Ronald kicked Roper in the thighs and groin. Roper decided to apply the X26 in "drive-stun mode." Deployed thus, a user removes the cartridge from the X26 and places the weapon's exposed electrodes in direct contact with the skin. "Drive-stun mode" does not incapacitate the target, but instead encourages the suspect to comply by causing pain. Over the next three minutes, Officers Roper and Guliano each tried to use Roper's X26 in this mode, but Ronald was flailing so wildly that they were never sure that they made good contact. They testified that most of the charge either went into the air or into the officers themselves as they passed the single X26 to each other. Even when they did make contact, the weapon seemed to have no effect on Ronald.

After the officers finally wrestled Ronald into submission, they turned to Cynthia, who was by then trying to assault Roper. It took two or three minutes and two deployments of the X26 to subdue her. When officers returned their attention to Ronald, they found that he had a weak pulse. Despite resuscitation efforts, Ronald went into cardiac arrest and died.

Dr. Kevin Horn performed the autopsy. Unlike in many cases of in-custody deaths, the only evidence of controlled substances in Ronald's system was marijuana metabolites. Dr. Horn did, however, discover that Ronald suffered from heart

disease. Ronald's body also showed signs of a struggle with "multiple, incidental" "[c]ontusions and abrasions." He had seven sets of burns consistent with "drive-stuns" from an X26 and two probes embedded in his lower left chest. Dr. Horn listed the cause of death as "excited delirium." He listed "hypertensive/atherosclerotic cardiovascular disease" as a contributing condition, but made no mention of the X26 in a similar role.

Subsequent investigation demonstrated that the officers pulled the X26's trigger a combined 22 times, but the discharges were not the uniform five-second cycle associated with the weapon.[2] It is unclear how long the X26 was in contact with Ronald while discharging.

B

The Marquez family ("Marquezes") brought this lawsuit. They sued TASER as the manufacturer of the X26 on a statelaw, strict liability theory of failure to warn. They asserted that TASER should have warned that repeated exposure to its products could lead to sudden death due to cardiac failure, particularly among those who are obese, mentally ill, or intoxicated. They also sued Officers Roper and Guliano for (1) excessive force in violation of the Fourth Amendment pursuant to 42 U.S.C. § 1983 and (2) state-law wrongful death.[3] Each party moved for summary judgment.

The district court granted summary judgment in favor of TASER after concluding that its warnings at the time of Ron-

---

[2]If an officer pulls and releases the trigger on the X26, it will discharge for five seconds. The discharge may be lengthened by continuing to depress the trigger after five seconds ends. It can be shortened by flipping a safety switch. The X26 discharges in this case were as short as one second and as long as eleven.

[3]The Marquezes also sued the City of Phoenix, but they have abandoned that claim on appeal.

ald's death were sufficient as a matter of law. The district court also concluded that the officers' repeated use of the X26 was reasonable given that "the officers were confronted with an individual suspected of serious crimes, who was a potential threat, and who, by all accounts, was resisting arrest."

The Marquezes timely appealed.

## II

## A

In challenging the district court's summary judgment order, the Marquezes first contend that the district court focused too much on TASER's warning about the risks associated with prolonged exposures to its products. In 2007, TASER provided the general warning that while its "weapons [are] designed to incapacitate a person from a safe distance while reducing the likelihood of serious injuries or death," officers needed "to remember that the very nature of use of force . . . involves a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances, and individual susceptibilities." TASER further warned that "[i]n some circumstances, in susceptible people, it is conceivable that the stress and exertion of extensive repeated, prolonged, or continuous application(s) of the TASER device may contribute to cumulative exhaustion, stress, and associated medical risk(s)."[4] TASER further warned that one of the risks associated with "exhaustive exertion" was Sudden In-Custody Death Syndrome.[5] The district

---

[4]The complete warning in effect at the time of Ronald's death is reproduced in the Appendix to this opinion.

[5]Rather than a specific medical condition, this "syndrome" is the term used to describe when an individual dies while in police custody of unknown causes. The phenomenon has been the target of much scientific study for more than a decade. *Cf.*, *Mann v. Taser Int'l Inc.*, 588 F.3d 1291, 1299 n.4 (11th Cir. 2009) (citing Carolyn B. Robinowitz, REPORT OF THE Counsel on SCIENCE AND PUBLIC HEALTH 453 (2009)).

court determined that these warnings "capture[d] the circumstances of this case" and were thus sufficient as a matter of law.

The Marquezes point to TASER's additional warning that, "[u]nrelated to TASER exposure, conditions such as excited delirium, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle may result in serious injury or death." The Marquezes contend that the inclusion of this additional language rendered TASER's warnings about prolonged exposure to its products equivocal and thereby inadequate.

**[1]** Under Arizona law, "[w]here a warning is required, the warning must be reasonably readable and apprise a consumer exercising reasonable care under the circumstances of the existence and seriousness of the danger sufficient to enable the consumer to protect himself against it." *Brown v. Sears, Roebuck & Co.*, 667 P.2d 750, 757 (Ariz. Ct. App. 1983).

**[2]** TASER's warnings meet this standard. In addition to warning that its products should generally be used with care, TASER specifically warned that "[w]hen practical, [officers should] avoid [using] prolonged or continuous exposure(s) to the TASER device's electrical discharge" because "in susceptible people it is conceivable that the stress and exertion of extensive repeated, prolonged or continuous application(s) of the TASER device may contribute to cumulative exhaustion, stress, and associated medical risk(s)." The warning also explains that one of the medical risks associated with exhaustion is Sudden In-Custody Death Syndrome. These warnings cover precisely what happened here. We are unpersuaded by the Marquezes' request that we read one piece of TASER's warnings out of context.

B

**[3]** The Marquezes also suggest that TASER should have provided a more specific warning that certain populations

may be at an increased risk of death when exposed to its products. In determining whether a warning provides enough detail, we must "be sensitive to many factors" because "excessive detail may detract from the ability of typical users and consumers to focus on the important aspects of the warnings." RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. i (1998); *cf. Powers v. Taser Int'l, Inc.*, 174 P.3d 777, 781-82 (Ariz. Ct. App. 2007) (noting that, absent controlling case law, the Arizona courts will look to the Restatement of Torts). When a case involves idiosyncratic reactions—usually an allergy but in this case an unusual reaction to the application of an electronic control device—a warning is required only "when the harm-causing [aspect of the product] is one to which a substantial number of people" would be subject. RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. k.

**[4]** TASER could have provided a stronger warning that specifically addressed risks faced by vulnerable populations. (A manufacturer can *always* provide more information.) But further detail could have detracted from officers' ability to process the warning that was given. *Id.* at cmt. i. And the Marquezes have neither shown that a "substantial number" of people were affected by the alleged idiosyncratic reaction nor explained what language they would have preferred. *Id.* Thus, we agree with the district court that such warning was sufficient as a matter of law.[6]

III

This brings us to the Marquezes' § 1983 claims against Officers Roper and Guliano. The Marquezes assert that they presented a triable issue of fact that the officers' use of force was unreasonable. The Marquezes do not dispute that Roper

---

[6]Because we affirm the district court's conclusion that this warning was sufficient, we need not reach TASER's alternative arguments for affirming the summary judgment award.

was justified in deploying his X26 in order to rescue Destiny, but they contend that any justification for the use of force dissipated once Destiny was at a safe distance.

[5] "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quotation marks omitted). We undertake this inquiry with great caution, making "allowance[s] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. While the existence of less forceful options to achieve the governmental purpose is relevant, "[p]olice officers . . . are not required to use the least intrusive degree of force possible." *Forrester v. City of San Diego*, 25 F.3d 804, 807-08 (9th Cir. 1994); *see also Gregory v. County of Maui*, 523 F.3d 1103, 1107 (9th Cir. 2008).

### A

First, we must consider the amount of force and the extent to which that force intruded on Ronald's Fourth Amendment rights. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). Regardless of how much force is involved in a single application of an X26, we agree that considerable force was used here. *Cf. Smith v. City of Hemet*, 394 F.3d 689, 700 (9th Cir. 2005) (en banc) (noting that all claims of force are analyzed under the *Graham* standard (citing *Ward v. City of San Jose*, 967 F.2d 280, 284 (9th Cir. 1992))).

[6] The record supports the inference that Ronald received nine five-second cycles from the X26: two while it was ineffectively deployed in "probe mode" and seven when it was

deployed in "drive-stun mode."[7] He was also wrestled into submission by two policemen. Together, these constituted a not-insignificant potential intrusion upon Ronald's Fourth Amendment rights. *See Scott v Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

B

Next, we balance Ronald's Fourth Amendment interests against the governmental interests at stake. Key to this inquiry are "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. But this list is not comprehensive. Instead, we examine the totality of the circumstances, including whatever factors may be relevant in a particular case. *See Bryan v. MacPherson*, 630 F.3d 805, 818 (9th Cir. 2010). For example, we have stated that if the police were summoned to the scene to protect a mentally ill offender from himself, the government has less interest in using force. *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1058 (9th Cir. 2003). By contrast, if the officer warned the offender that he would employ force, but the suspect refused to comply, the government has an increased interest

---

[7]The Marquezes assert that Ronald was, in fact, shocked more than twenty times. While the X26's data recording system does show that the trigger was depressed 22 times, Officers Roper and Guliano have consistently testified that most of these discharges were into the air. In light of this testimony, the Marquezes must bring forth more than mere allegations to survive summary judgment. *See Gregory*, 523 F.3d at 1106 n.3. "[C]arefully examin[ing] all the evidence in the record, such as medical reports, contemporaneous statements by the officer and the available physical evidence," *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994), we conclude that Ronald received, at most, seven full "drive-stun" cycles of the X26 (one for each set of burn marks found at his autopsy). Similar review indicates that the officers ended their use of the X26 after Ronald was in handcuffs. The Marquezes' assertions to the contrary rely entirely on an inaccurate transcription of Officer Roper's interview with Phoenix's Professional Standards Bureau.

in the use of force. *See Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).

**[7]** Here the relevant factors favor a finding that this use of force was reasonable. Once Roper and Guliano traversed Ronald's barricade, they were greeted by a blood-spattered room, an injured adult, and a child in evident distress. This alone was cause to believe that at least one serious crime had occurred. As a result, this case is easily distinguished from the only instance in which we have found the use of an electronic control device to be unreasonable—where officers deployed the device in "probe mode" against two unarmed women, who had committed (at most) minor infractions and who were not actively resisting arrest. *Mattos*, 661 F.3d at 445. It also renders inapposite those cases in which police are summoned to protect mentally disturbed individuals from themselves. *See, e.g.*, *Drummond*, 343 F.3d at 1058.

**[8]** Ronald—who was warned that he would be "tased" if he did not comply—was also actively resisting arrest. Though the Marquezes allege that any apparent resistance was, in fact, involuntary muscle spasms caused by the X26, they have offered no proof. By contrast, Officers Roper and Guliano have consistently testified that Ronald was actively struggling, pushing his knees into his body so that he could use his feet both to lever himself off the bed and to kick the officers. For example, he kicked Roper in the groin after he removed the cartridge and before Roper began redeploying it (when, under the Marquezes' own theory, there should have been no X26-induced movement). Nothing "in the record, such as medical reports, contemporaneous statements by the officer [or] the available physical evidence," *Gregory*, 523 F.3d at 1106-07 & n.3, undermines the officers' credibility. Indeed, the autopsy—the only available medical evidence—shows numerous incidental contusions and is consistent with a prolonged struggle. In light of this evidence, the Marquezes may not rely on mere allegations to defeat summary judgment. *Id.*

**[9]** For similar reasons, the officers could reasonably have thought that Ronald posed an immediate risk to Cynthia. We "have [repeatedly] observed that '[t]he volatility of situations involving domestic violence' makes them particularly dangerous.' " *Mattos*, 661 F.3d at 450 (alteration in original) (quoting *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005)). While Ronald was clearly not hitting Cynthia while he was choking Destiny, the Marquezes do not explain why the officers could not reasonably have thought that she would be his next target if they left given her visible injuries and the amount of blood in the room.

**[10]** Furthermore, the officers could reasonably have believed that they were themselves in danger. Officers are well aware that more of their colleagues are injured on domestic violence calls than on any other sort. *Id.* As a result, "[w]hen officers respond to a domestic abuse call, they understand that violence may be lurking and explode with little warning." *Id.* (internal quotation marks omitted). Roper has consistently stated that Ronald began assaulting him as soon as Guliano had removed Destiny (that is, before Guliano himself entered the room). And the Marquezes' suggestion that Roper simply disengage and leave is unrealistic. Roper would have had to expose himself to further injury as he tried to squeeze his body through a partially open door that was angled into the room. Officers would then have had to force their way back into the room to arrest Ronald or to help Cynthia if she needed it.

**[11]** In summary, although the officers used significant force in this case, it was justified by the considerable government interests at stake.[8]

_____

[8]Because we conclude that there was no constitutional violation here, we need not reach the district court's alternative conclusion that the officers were entitled to qualified immunity because any violation of the Fourth Amendment was not clearly established at the time of the incident. *Cf. Pearson v. Callahan*, 555 U.S. 223, 236 (2009). We do note, however,

IV

**[12]** Finally, the Marquezes argue that the district court improperly granted summary judgment on their state law claims against the officers for wrongful death. Because we conclude that the officers acted reasonably in using force, this claim cannot succeed under Arizona law unless (1) the use of the X26 constituted "deadly force," and (2) the use of deadly force was not justified. *Compare* ARIZ. REV. STAT. § 13-409 (providing law enforcement officers with immunity for all reasonable uses of non-deadly force), *with* ARIZ. REV. STAT. § 13-410 (requiring an additional showing to immunize the use of deadly force).

**[13]** We are not convinced that the use of an X26 involves deadly force. Arizona law defines "deadly physical force" as: "force that is used with the purpose of causing death or serious physical injury or in the manner of its use or intended use is capable of creating a substantial risk of causing death or serious physical injury." ARIZ. REV. STAT. § 13-105(14). The Marquezes point to no case either in Arizona or in federal courts finding use of any electronic control device to be deadly force. And they have produced no evidence that an

---

our recent discussion in *Mattos.* As that case makes clear, as late as 2006 there was no case law even suggesting—let alone clearly establishing—that the use of an electronic control device on an individual suspected of domestic violence who was actively resisting arrest violated the Constitution. *Cf. Mattos*, 661 F.3d at 452 (noting that there was not even sufficient case law clearly to establish that using an electronic control device against the alleged victim of domestic violence violated the Constitution). While this incident occurred several months later, there were no intervening legal developments, which would have placed any possible violation that occurred in this case "beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). *See generally Cockrell v. City of Cincinnati*, 2012 U.S. App. Lexis 3787, *11 (6th Cir. 2012) (unpublished) (collecting cases and concluding that as of 2009 courts had granted qualified immunity whenever "plaintiffs [were] tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers").

X26 is capable of creating a *substantial* risk of death or serious physical injury. At most there is evidence in the form of scientific journals that it carries a potential risk of injury in a very small group of people.

[14] But even if the X26 did qualify as "deadly force"—a matter we need not decide—no reasonable jury could find that the circumstances here failed to justify the use of deadly force. The use of deadly force is permissible under Arizona law if an officer reasonably believes that it is necessary to "effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes . . . is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay." ARIZ. REV. STAT. § 13-410(C)(2)(c); *see also Garcia v. United States*, 826 F.2d 806, 812 & n.14 (9th Cir. 1987) (applying Arizona law under Federal Tort Claims Act to conclude that an officer was justified in using deadly force to prevent a "felonious and deadly assault" on himself by a suspect attacking him with a stick and a rock) (citing ARIZ. REV. STAT. § 13-410). No reasonable jury could find that Marquez was unlikely to endanger human life or inflict serious bodily injury if not subdued: at first, he would not release his granddaughter from a choke-hold, then he struggled viciously in close quarters against the officers attempting to restrain him, and his daughter, who had also been the victim of his attacks, remained in the room throughout. Thus, the district court properly awarded summary judgment on this claim.

**AFFIRMED.**

**APPENDIX**



**TASER**
INTERNATIONAL
*saving lives every day*

## Product Warnings – Law Enforcement

### IMPORTANT SAFETY AND HEALTH INFORMATION

Read, understand, and follow the training, safety instructions, and warnings before using the TASER device. *(These warnings are effective June 8, 2006, and supersede all prior revisions for TASER devices.)*[1]



**Electronic Control Device**
Temporarily incapacitates target
Can cause injury
Use only if trained
Obey Product Warnings and Manual
See www.TASER.com/safety

This warning label appears on newer TASER device models.

TASER® electronic control devices are weapons designed to incapacitate a person from a safe distance while reducing the likelihood of serious injuries or death. Though they have been found to be a safer and more effective alternative when used as directed to other traditional use of force tools and techniques, it is important to remember that the very nature of use of force and physical incapacitation involves a degree of risk that someone will get hurt or may even be killed due to physical exertion, unforeseen circumstances and individual susceptibilities.

### OPERATIONAL SAFETY

To minimize the risk of injury before, during, and after use, consider the following:

#### Minimize Risks Before Use

**Read and Heed.** Read, understand, and follow all instructions and warnings before using the TASER device.

**Complete Training First.** Do not attempt to use a TASER device unless you have been trained and certified by a TASER International, Inc. certified instructor in its application.

**Obey Applicable Laws.** Carry and use the TASER device in accordance with applicable federal, state, and local laws as well as your law enforcement agency's guidance—policies, procedures, training, etc. Each TASER device discharge must be legally justified.

**Store in a Secure Location.** Store TASER device(s) in a secure location inaccessible to children and other unauthorized persons. TASER devices are not toys, and users should avoid any inappropriate deployments and/or activations, which may result in serious bodily harm to the user or others, including animals.

#### Minimize Risks During Use

**Avoid Torturous or Other Misuse.**

**Assume Device is Loaded.** Always assume that a TASER device is loaded.

---

[1] These warnings cannot address all possible force application circumstances. They are intended to inform you about potential risks of harm, but the decision to use the TASER device in a particular circumstance must be made in light of applicable legal standards and available alternatives. These warnings do not create a more restrictive standard of care than applicable legal standards.

 **TASER**
INTERNATIONAL
*saving lives every day*

# Product Warnings – Law Enforcement

**Avoid Unintentional Activation.** Keep finger away from trigger until ready to use.

**Keep Body Parts Away From Front.** Keep your hands and body parts away from the front of the TASER cartridge.

**Avoid Static Electricity Discharge.** Avoid contact between static electricity and the TASER cartridge since static electricity can cause unexpected discharge.

## DEPLOYMENT WARNINGS

To minimize the risk of injury during or from deployment, follow these guidelines:

### Deployment Safety Procedures

**Avoid Weapons Confusion.** Handguns have been confused with TASER devices. Learn about the differences in physical feel and holstering characteristics between the TASER device and your handgun. This will allow you to confirm device identity under stressful situations. Follow agency's equipment carrying guidelines and training.

**Select Preferred Target Areas.** The preferred target areas are the subject's torso (center mass) or legs. Avoid intentionally aiming a TASER device at the head or face without justification.

**Avoid Sensitive Areas.** Significant injury can occur from TASER device deployment into sensitive areas of the body such as the eyes, throat, or genitals—avoid intentionally targeting these areas without justification.

**Avoid Known Pre-Existing Injury Areas.** When practical, avoid deploying a TASER device at a known location of pre-existing injury (e.g., avoid targeting the back for persons with known pre-existing back injuries, avoid targeting the chest area on persons with a known history of previous heart attacks, etc.). These injuries may be provoked by such deployment.

**Beware—TASER Device Can Ignite Explosive Materials, Liquids, or Vapors.** These include gasoline, other flammables, explosive materials, liquids, or vapors (e.g., gases found in sewer lines, methamphetamine labs, and butane-type lighters). Some self-defense sprays use flammable carriers such as alcohol and could be dangerous to use in immediate conjunction with TASER devices.

**Reload and Deploy.** If a TASER device application is ineffective in achieving the desired effect, consider reloading and redeploying or using other force option(s), according to approved training and policy.

**Plan Deployment Backup.** No weapons system, tool, or technique is effective 100% of the time. Consider acceptable options, alternatives, and backup plans in case of ineffective deployment when deploying, activating, or otherwise using a non-lethal weapon, including TASER devices.

**Control and Restrain Immediately.** Begin control and restraint procedures as soon as it is reasonably safe to do so in order to minimize the total duration of exertion and stress experienced by the subject. User should avoid touching the probes and wires and the areas between the probes during TASER electrical discharge.

### Deployment Health Risks

**Sudden In-Custody Death Syndrome Awareness.** If a subject is exhibiting signs or behaviors[2] that are associated with Sudden In-Custody Death Syndrome,[3] consider combining use of a TASER device with immediate physical restraint techniques and medical assistance.

---

Signs of Sudden In-Custody Death Syndrome include: extreme agitation, bizarre behavior, inappropriate nudity, imperviousness to pain, paranoia, exhaustive exertion, "superhuman" strength, hallucinations, sweating profusely, etc.



**TASER**
INTERNATIONAL
*saving lives every day*

# Product Warnings – Law Enforcement

**Continuous Exposure Risks.** When practical, avoid prolonged or continuous exposure(s) to the TASER device's electrical discharge. In some circumstances, in susceptible people, it is conceivable that the stress and exertion of extensive repeated, prolonged, or continuous application(s) of the TASER device may contribute to cumulative exhaustion, stress, and associated medical risk(s).

**Other Conditions.** Unrelated to TASER exposure, conditions such as excited delirium, severe exhaustion, drug intoxication or chronic drug abuse, and/or over-exertion from physical struggle may result in serious injury or death.

**Breathing Impairment.** Extended or repeated TASER device exposures should be avoided where practical. Although existing studies on conscious human volunteers indicate subjects continue to breathe during extended TASER device applications, it is conceivable that the muscle contractions may impair a subject's ability to breathe. In tests conducted on anesthetized pigs repeated TASER device applications did cause cessation of breathing during TASER device discharges, although it is unclear what impact the anesthesia or other factors may have had on the test results. Accordingly, it is advisable to use expedient physical restraint in conjunction with the TASER device to minimize the overall duration of stress, exertion, and potential breathing impairment particularly on individuals exhibiting symptoms of excited delirium and/or exhaustion. However, it should be noted that certain subjects in a state of excited delirium may exhibit superhuman strength and despite efforts for expedient restraint, these subjects sometimes cannot be restrained without a significant and profound struggle.

**Permanent Vision Loss.** If a TASER probe becomes embedded in an eye, it could result in permanent loss of vision.

**Seizure Risks.** Repetitive stimuli such as flashing lights or electrical stimuli can induce seizures in some individuals. This risk is heightened if electrical stimuli or current passes through the head region.

## Post-Deployment Procedures—Wound and Injury Care

**Probe Removal.** In most areas of the body, injuries or wounds caused by TASER probes will be minor. TASER probes have small barbs. There is a possible risk of probes causing injury to blood vessels. Follow your training and agency's guidance for probe removal.

**Skin Wound Treatment.** TASER devices can cause skin irritation, small puncture wounds, friction abrasions, minor burns, etc. As with any injury of this type, in some circumstances infection(s) may occur. Thus, appropriately cleanse any such wounds and if necessary seek medical attention.

### HEALTH RISKS

**Response to Exposure.** The TASER device can cause temporary discomfort, pain, stress, and panic, which may be injurious to some people.

**Muscle Contraction-Related Risks.** The TASER device can cause strong muscle contractions that may result in physical exertion or athletic-type injuries. In certain instances this may be serious for some people, such as those with pre-existing conditions and/or special susceptibilities. This may also occur in instances where a person has an unusual and/or unanticipated response to the TASER device deployment and/or discharge.

---

[3] Sudden in-custody death results from a complex set of physiological and psychological conditions characterized by irrational behavior, extreme exertion, and potentially fatal changes in blood chemistry. Promptly capturing, controlling, and restraining a subject exhibiting signs of these conditions may end the struggle and allow early medical care intervention.



**TASER**
INTERNATIONAL
*saving lives every day*

# Product Warnings – Law Enforcement

**Secondary Injury Risks.** TASER-induced strong muscle contractions usually render a subject temporarily unable to control his or her psychomotor movements. This may result in secondary injuries such as those due to falls. This loss of control, or inability to catch oneself, can in special circumstances increase the risk(s) of serious injury or death. Persons who are physically infirm or pregnant are among those who may be at higher risk. Other persons at higher risk include: those located on elevated or unstable platforms (e.g., trees, roofs, ladders, ledges, cranes, loading docks), operating a vehicle or machinery, or those who are running. Persons located in water may drown if their ability to move is restricted.

**Strain Injury Risks.** It is possible that the injury types may include, but are not limited to, strain-type injuries such as hernias, ruptures, dislocations, tears, or other injuries to soft tissue, organs, muscles, tendons, ligaments, nerves, and joints. Fractures to bones, including vertebrae, may occur. These injuries may be more likely to occur in people with pre-existing injuries or conditions such as pregnancy, osteoporosis, osteopenia, spinal injuries, diverticulitis, or in persons having previous muscle, disc, ligament, joint, or tendon damage. It is believed that the risk of these injuries is comparable to or less than the risk(s) from vigorous physical exertion, such as weight training, wrestling, or other intense athletic endeavors.

**Scarring.** Use of a TASER device, especially in drive (or touch) stun mode, can cause marks, friction abrasions, and/or scarring that may be permanent depending on individual susceptibilities or circumstances surrounding TASER device use and exposure.

**Laser Beam Eye Damage.** The TASER device incorporates a laser aiming aid. Laser beams can cause eye damage. Avoid intentionally aiming at the eye(s) of a person or animal.

## MAINTENANCE

**Avoid Dropping Device.** Dropping a TASER device may damage it. If a device has been dropped or damaged do not attempt to place the safety switch in the up (ARMED) position until completing the procedure recommended in the current version of the TASER International, Inc. Instructor Training materials.[4]

**Avoid Exposure to Significant Moisture.** If a device has been exposed to significant moisture,[5] do not attempt to place the safety switch in the up (ARMED) position until completing the procedure recommended in the current version of the TASER International, Inc. Instructor Training materials.[4]

**Use Only Approved Components, Batteries, Accessories, and Cartridges.** The TASER device is a sophisticated electronic system. Only TASER International, Inc. approved components, batteries, proper accessories, and TASER Cartridges are to be used with the TASER device in order to ensure proper function and effects. Use of anything other than recommended batteries, TASER Cartridges, or other TASER-recommended accessories (excluding holsters), or repairs/modifications by unauthorized persons may cause malfunctions, will void the warranty, and may put the user, suspects, and others at risk of serious injury or even death.

---

[4] The TASER International, Inc. Instructor Training syllabus and other warnings and instructions are available online at www.TASER.com.

[5] Incidental moisture, such as brief exposure to light or moderate rain, should not affect the operation of the TASER device. If the TASER device has been drenched or immersed in water or other liquid, however, do not use it until it has been inspected and tested in accordance with the TASER International, Inc. Instructor Training syllabus.

SCHROEDER, Circuit Judge, Dissenting, in part:

I agree with the majority that TASER adequately warned that repeated shocks in stressful situations could lead to death. I therefore disagree with the majority's holding that the force was not deadly. Because there was no established law on the point at the time of Ronald's death, however, I concur in the result on the federal claim discussed in Part III of the majority opinion. The officers were entitled to qualified immunity. *See Mattos v. Agarano*, 661 F.3d 433, 452 (9th Cir. 2011) (en banc).

The state law claims of excessive force, however, should have gone to the jury. The officers, in their own words, "panicked" when faced with this unarmed, mentally ill man. They attacked Ronald with the X26 while "flipping [it] on and off," and they pulled the trigger a total of 22 times. The coroner found five pairs of taser burn marks on Ronald's chest and two taser probes embedded in his chest. A recent study published in a journal of the American Heart Association has concluded that a single taser shock to the chest can kill. *See* Douglas P. Zipes, *Sudden Cardiac Arrest and Death Associated with Application of Shocks from a TASER Electronic Control Device*, Circulation, Apr. 30, 2012, at 4 (analyzing the medical records of eight men, seven of whom died after being tased in the chest area, and concluding that shocks from an X26 can cause cardiac arrest). Two more pairs of burn marks were found elsewhere on Ronald's body. Ronald died immediately following this attack. The majority states that it is "not convinced that the use of an X26 involves deadly force." Even if we are not "convinced" that the officers used deadly force, neither are we in a position to decide the issue as a matter of law.

The majority goes on to conclude that if the force used was deadly, such force was justified under the circumstances. This too is a question of fact. Whether use of a deadly weapon at close range in a small, crowded room was nevertheless justi-

fied by Ronald's threatening conduct is an issue that should be decided by the jury. No Arizona decision under Arizona Revised Statute § 13-410(c)(2)(c) supports resolving the question as a matter of law. The case the majority cites, *Garcia v. United States*, 826 F.2d 806 (9th Cir. 1987), involved a direct attack on a border patrol agent and was decided under a different section of the statute.

Accordingly, I would vacate the judgment in favor of the defendants on the state law claims and remand for further proceedings as to those claims. I therefore must respectfully dissent from the portion of the majority's opinion that affirms the dismissal of the state law claims.